IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SHELL OFFSHORE INC.<br>　　　　Plaintiff<br><br>v.<br><br>ENI PETROLEUM US LLC and<br>ENI PETROLEUM CO. INC.<br>　　　　Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action<br><br>CASE NO.: 16-cv-15537<br><br>SECTION: _____<br><br>JUDGE: _____ |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, Shell Offshore Inc. ("Shell" or "Plaintiff"), files its Original Complaint and in support would respectfully show this Court the following:

### I. PARTIES

1. Plaintiff, Shell Offshore Inc. ("Shell" or "SOI"), is a corporation organized and existing under the laws of Delaware with its principal business office located at 150 North Dairy Ashford, Houston, TX, 77079.

2. Defendant, Eni Petroleum US LLC, is a Delaware limited liability company with its principal place of business located at 1201 Louisiana Suite 3500, Houston, TX, 77002.  Eni may be served through its registered agent for service of process Capitol Corporate Services, Inc., 206 E. 9th Street, Suite 1300, Austin, TX, 78701.

3. Defendant, Eni Petroleum Co. Inc., a Delaware corporation with its principal place of business located at 1201 Louisiana Suite 3500, Houston, TX, 77002.  Eni may be served through its registered agent for service of process Capitol Corporate Services, Inc., 206 E. 9th Street, Suite 1300, Austin, TX, 78701.

4. Eni Petroleum US LLC and Eni Petroleum Co. Inc. are collectively referred to as "Eni" or the "Eni Defendants."

## II. JURISDICTION AND VENUE

5. Jurisdiction is proper pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331, et seq., and 43 U.S.C. § 1349(b)(1).

6. Venue is proper in the Eastern District because the contract and actions at the center of this dispute involve operations engaging in the exploration, development, and production of minerals off the coast of Louisiana on the Outer Continental Shelf. 43 U.S.C. § 1349(b). This Court has personal jurisdiction over both Eni Petroleum US LLC and Eni Petroleum Co. Inc. as each has the requisite minimum contacts with Louisiana.

## III. FACTUAL BACKGROUND

### A. Contractual Relationship

7. Shell and Eni, and/or their predecessors-in-interest, are parties to a Unit Operating Agreement effective June 15, 1988. This original unit operating agreement related to the exploration, development, and production operations of the Green Canyon Field, involving Blocks 72, 73, 116, and 117 on the Outer Continental Shelf off the coast of Louisiana ("Popeye").

8. The Popeye Unit Operating Agreement was revised and amended by agreement on November 1, 1992. This revised Unit Operating Agreement ("Unit Operating Agreement" or "UOA") is the current operative agreement, detailing the duties, responsibilities, and relationship between Shell, as the designated operator, and the non-operating parties in the development of these areas.

9. At Popeye, Eni is one of two non-operating interest owners.

10. At Popeye, the interest owners include: Shell, as Operator (37.5%); Eni (50%); and Mobil Oil Exploration & Producing Southeast Inc. ("ExxonMobil") (12.5%).

11. Pursuant to its obligations under the Popeye UOA, Shell, as the designated Operator, has the "exclusive right and duty to conduct all operations" in a "good and workmanlike manner, as would a prudent operator under the same or similar circumstances."

12. All drilling operations under the Popeye UOA are to be completed by "properly qualified drilling contractors under contracts which were considered competitive when executed."

13. According to the Popeye UOA, the Operator has the obligation to pay all operational costs and then "each Party shall reimburse Operator in proportion to its Participating Interest."

14. Non-operators must pay their proportion of the bills "within thirty (30) days after receipt." If payment is not made, the unpaid balance bears monthly interest, "plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts."

15. Eni has not fulfilled its obligation of reimbursement for joint interest billings and expenses related to certain rig operations and the abandonment of four wells at Popeye.

B. **Operations During the Government-Imposed Drilling Moratorium**

16. On May 30, 2010, a month after the Deepwater Horizon drilling rig explosion, the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEM") issued a Notice to Lessees and Operators ("NTL") 2010-N04 imposing a six-month moratorium on all drilling of deep water wells on the Outer Continental Shelf.[1]

17. On June 8, 2010, the BOEM issued NTL 2010-N05 imposing various new safety certification requirements, including Blowout Preventer ("BOP") recertification, for all operations for energy development on the Outer Continental Shelf.

---

[1] A preliminary injunction was issued on June 22, 2010, suspending the original moratorium, but on July 12, 2010, the BOEM was advised to suspend all deep water well permits until November 30, 2010, creating a new moratorium on deep water drilling.

18. On June 18, 2010, the BOEM issued NTL 2010-N06 requiring additional analysis for exploration plans of the environmental effect including potential blowout scenarios.

19. Shell utilized Noble's Jim Thompson rig and other support vessels and equipment to drill and develop the parties' mineral interests at Popeye.

20. During this government imposed drilling moratorium—and the subsequent time period required to obtain the new third party safety certifications required for future Applications for Permits to Drill—the Jim Thompson rig and other support vessels and equipment were "warm stacked" in a state of operational readiness to ensure they could be quickly re-deployed for drilling once the moratorium was lifted and all certifications were acquired.

21. In fact, due to its readiness, Shell was one of the first operators, if not the first, to drill a well in the Gulf of Mexico after the moratorium was lifted.

22. Eni has refused to pay its portion of the Joint Interest Billings for the operational costs related to the Jim Thompson rig and other support vessels and equipment during the moratorium and re-certification time period imposed by the government. The other non-operating party has paid its portion of the costs.

C. **Abandonment of Four Wells at Popeye**

23. The Atwood Condor drilling rig was utilized to perform abandonment work at Popeye.

24. Eni has also refused to pay its portion of the joint interest billings and costs related to the necessary abandonment of four wells at Popeye.

25. For any well abandonment required by a governmental authority, the UOA provides the abandonment "shall be accomplished by the Operator with the costs, risks, and net proceeds, if any, to be shared by the Parties . . . in proportion to their Participating Interest."

26. On or about April 23, 2015, Shell notified all non-operators that the BOEM had deemed the Popeye A01 and Popeye A04 wells as "idle iron" requiring proper abandonment of the wells. Shell also submitted informational Authorization for Expenditures to the non-operating parties detailing the estimated costs for the permanent abandonment of these wells.

27. On or about June 17, 2015, and other pertinent times, Shell provided additional information to Eni at its request regarding the estimated costs of abandonment and further documentation of the BOEM's determination that the Popeye wells A01 and A04 were being subject to its idle iron program promulgated under NTL 2010-G05.

28. Shell provided Eni with an updated estimate for costs of the abandonments of the Popeye A01 and Popeye A04 wells on September 10, 2015, detailing a cost savings below initial estimates.

29. When operations concluded, the parties realized substantial cost savings below the amounts set forth in the applicable Authorizations for Expenditure and/or Authorizations for Retirement ("AFE/AFR"). Throughout, Shell provided Eni with monthly invoices of outstanding costs billed to the joint account for expenses related to the abandonment of the Popeye A01 and A04 wells.

30. Eni has failed to pay its proportionate share of the joint interest billings related to the abandonment of the Popeye A01 and the Popeye A04 wells even though it has a fifty percent (50%) working interest in the lease requiring it to pay fifty percent (50%) of the joint interest billings.

31. On May 21, 2015, Shell notified the non-operators that 2 other wells in the field were no longer viable. The Popeye A02 well failed on April 30, 2015, and due to various constraints (including the failure of the A02 well) it became no longer economically feasible to

attempt to continue the flow of the Popeye A03 well. Eni and the other non-operating interest owner agreed or otherwise did not object to the recommendation to pursue termination of the unit and relinquish the unit leases.

32. Subsequently, Eni issued approval for the costs associated with the decommissioning of the Flowline Flushing at the Popeye well sites as part of the abandonment process.

33. On or about August 19, 2015, Shell provided Eni with an updated outline of the proposed schedule for the abandonment of the Popeye wells.

34. On November 20, 2015, Shell provided the non-operators the informational AFE/AFR, detailing the estimated projected costs that would be billed to the joint account for the abandonment of the Popeye A02 and the Popeye A03 wells.

35. At the request of Eni, Shell provided further detailed technical information regarding the Plug and Abandon procedures to be utilized for the Popeye A02 and the Popeye A03 wells on January 12, 2016.

36. Shell provided Eni with monthly invoices of outstanding costs billed to the joint account for expenses related to the abandonment of the Popeye A02 and A03 wells.

37. Eni has failed to make payments for the costs associated with the abandonment of the Popeye A02 and the Popeye A03 wells.

38. Shell successfully completed the four-well decommissioning campaign safely and substantially under target estimations.

39. Because of Eni's refusal to pay its legally obligated amounts, Shell was left with no choice but to file this action to collect the moneys legally due from Eni, the only non-operator who has not paid its share of joint interest billings.

## IV. CLAIMS AND CAUSES OF ACTIONS FOR DAMAGES

### COUNT 1: BREACH OF CONTRACT

40. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 39 of this Complaint with the same force and effect as if fully set forth herein.

41. The Popeye Unit Operating Agreement as amended governs the duties, responsibilities, and relationship between Shell as operator and the non-operators in the exploration, development, and production of the referenced oil and gas leases. Shell has performed under the agreement. Pursuant to this agreement, Eni is required to reimburse the joint interest billing account for its share of costs and expenses within thirty (30) days of receipt of each joint interest billing statement. Eni is obligated to pay the billings even if protested.

42. Eni has refused to reimburse the joint interest billing account for costs and expenses resulting from the abandonment of the Popeye A01 well.

43. Eni has refused to reimburse the joint interest billing account for costs and expenses resulting from the abandonment of the Popeye A02 well.

44. Eni has refused to reimburse the joint interest billing account for costs and expenses resulting from the abandonment of the Popeye A03 well.

45. Eni has refused to reimburse the joint interest billing account for costs and expenses resulting from the abandonment of the Popeye A04 well.

46. The other non-operating joint interest owner has reimbursed the joint interest billing account for its portion of the abandonment costs associated with the Popeye A01, A02, A03, and A04 wells.

47. Eni has also refused to reimburse the joint interest billing account for costs and expenses related to the operations during the BOEM required moratorium instituted after the Macondo incident.

48. The other non-operating party has reimbursed the joint interest billing account for the operational costs and expenses incurred during the moratorium.

49. Shell, acting as a prudent operator and abiding by its agreement, fronted all of the necessary costs for the required well abandonments and the costs to maintain operational readiness during the moratorium.

50. Eni has refused to pay the costs and expenses due and owing and has breached its contractual duties to Shell.

## COUNT 2: UNJUST ENRICHMENT

51. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 39 of this Complaint.

52. Shell paid and fronted all costs associated with the plugging and abandonment of the Popeye A01, A02, A03 and A04 wells. Eni has been unjustly enriched by enjoying the benefits of the satisfied expenses despite not paying its owed portions.

53. Eni has also refused to pay its portion of the joint interest billings for the operational costs of the Jim Thompson rig during the Macondo moratorium; yet, Eni enjoyed the benefits of the expenditures and having the rig remain operationally ready. Accordingly, Eni has been unjustly enriched.

## COUNT 3: OPEN ACCOUNT

54. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 39 of this Complaint.

55. The financial relationship and arrangement between Shell and Eni can be viewed as an open account under Louisiana law. Shell has made specific requests for payment via letters and invoices which included specific amounts due to Shell by Eni. Therefore, Eni's failure to pay the amount legally due and owing is a violation of Louisiana's open account statute, and pursuant to La. R.S. 9:2781 Shell is entitled to legal interest from the date of default until paid, reasonable attorneys' fees and costs incurred in collecting this claim to the extent these amounts are in addition to amounts due under the Unit Operating Agreement.

### COUNT 4: ATTORNEYS' FEES

56. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 39 of this Complaint.

57. Because of the acts and omissions of Eni as stated in the paragraphs above, Plaintiff has had to retain the services of the undersigned attorneys and has incurred reasonable and necessary attorneys' fees to prosecute its claims.

58. Pursuant to La. R.S. 9:2781, as well as the provisions of the Popeye Unit Operating Agreement, Shell is entitled to recover its reasonable and necessary attorneys' fees.

### V. DAMAGES

59. Plaintiff has suffered damages within the jurisdictional limits of this Court.

60. Plaintiff's damages include but are not limited to:

61. Plaintiff's actual damages as a result of Eni's breach of contract;

62. The benefit of its bargain;

63. Attorney's fees;

64. Costs of court;

65. Other costs in connection with the collection of unpaid amounts;

66. Pre-judgment and post-judgment interest at the highest rates allowed by the Unit Operating Agreement and law; and

67. Such other or enhanced or increased damages as may be allowed by law or equity.

### VI. CONCLUSION

68. Plaintiff expressly reserves all rights and remedies available to it pursuant to the Unit Operating Agreement and any applicable law for all damages arising from or connected in any way to these agreements.

69. ACCORDINGLY, Plaintiff, Shell Offshore Inc., prays that, after due proceedings be had, there be judgment rendered in its favor against the Eni Defendants for all damages alleged, together with pre-judgment and post-judgment interest, costs and attorneys' fees and for all general and equitable relief.

Respectfully submitted,

**KUCHLER POLK SCHELL WEINER & RICHESON, L.L.C.**

s/ Deborah D. Kuchler
Deborah D. Kuchler, T.A. (La. Bar No. 17013)
Janika Polk, T.A. (La. Bar No. 27608)
Leigh Ann Schell (La. Bar No. 18911)
Melissa D. Fuller (La. Bar No. 33093)
1615 Poydras Street, Suite 1300
New Orleans, Louisiana 70112
Telephone: 504/592-0691
Facsimile: 504/592-0696
dkuchler@kuhclerpolk.com
jpolk@kuchlerpolk.com
lschell@kuchlerpolk.com
mfuller@kuchlerpolk.com
ATTORNEYS FOR SHELL OFFSHORE INC.