UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| SHELL OFFSHORE, INC., | CIVIL DOCKET |
| Plaintiff | |
| VERSUS | NO. 16-15537 |
| ENI PETROLEUM US LLC, ET AL., | SECTION: "E"(2) |
| Defendants | |

# ORDER AND REASONS

Before the Court are four motions in limine to exclude or limit certain expert testimony at trial. Plaintiff Shell Offshore, Inc. ("SOI") moves to exclude or limit the testimony of Defendant ENI Petroleum US LLC's ("ENI") proposed experts Jim Bryan,[1] Tom Lee,[2] and Geoffery Kimbrough.[3] ENI moves to exclude the testimony of SOI's proposed expert Lance Labiche.[4] Because the parties retained these four experts to render opinions regarding substantially similar issues,[5] and the parties' objections to each of those opinions overlap significantly,[6] the Court considers the objections together and rules as follows.

## BACKGROUND

ENI's proposed expert Bryan offers four opinions:

1. SOI's charges to the Popeye Joint Account for above market rate equipment for the Popeye abandonments is inconsistent with industry customs and practices.
2. SOI did not act as a prudent operator as that term is understood in the industry because SOI withheld important information from Eni and did not act in the best interest of the joint account.

---

[1] R. Doc. 191.
[2] R. Doc. 196.
[3] R. Doc. 187.
[4] R. Doc. 188.
[5] R. Doc. 188-2 at 6, R. Doc. 339 at 1; R. Doc. 191-4 at 4; R. Doc. 258-1 at 4–5; R. Doc. 184-4 at 2–3.
[6] *Compare* R. Doc. 196, *with* R. Docs. 187, 188, 191.

1

3. SOI's submittal to Eni of "for information only" Authorization for Expenditures (AFEs) for abandonment of the Popeye wells is not consistent with industry customs and practices regarding the use of information only AFEs.
4. Short payment of joint interest billings is a common industry practice when a non-operator protests all or part of a billing, including in particular when an operator bills for costs incurred for a scope of work that was not authorized by the non-operator.[7]

ENI's proposed expert Lee offers five opinions:

1. Long-term rig contracts on ultra-deepwater drill ships are not entered into for plugging and abandonments ("P&A") of wells, but rather for the drilling of wells.
2. Industry custom does not recognize "drilling operations" to include plugging and abandonment operations.
3. SOI planned and issued improper abandonment AFEs for the Popeye #A1 and A4 and the Popeye #A2 and A3 wells as "information only" AFEs.
4. The practice of "short payment" has been a utilized and customary practice in the industry.
5. Shell's conduct does not meet the "prudent operator" standard.[8]

ENI's proposed expert Kimbrough offers four opinions:

1. Shell's use of the Atwood Condor was not consistent with industry practice of prudent operators.
2. The Atwood Condor was not necessary or proper equipment for the Popeye abandonments.
3. An AFE for approval is required for an abandonment project even if that project relates to a governmentally required abandonment operation.
4. The Popeye wells could have been P&A'd safely, effectively, successfully, and in compliance with federal regulations using the Ensco 8505 or other market priced rigs available during the time period that the Popeye P&As were planned and conducted, and at a significantly lower cost than Shell incurred.[9]

SOI's proposed expert Labiche offers nine opinions:

1. There are federal laws and regulations that govern abandonment operations for Operators and Co-Owners.
2. It is industry custom for Operators to enter long term rig contracts for a variety of oil and gas operations.

---

[7] R. Doc. 191-4 at 5.
[8] R. Doc. 258-1 at 7–14.
[9] R. Doc. 184-4 at 5.

2

3. It is industry custom and practice (consistent with a regulatory requirement) for Operators to use the best and safest technology whenever practical when conducting well operations.
4. SOI was not obligated to request an extension of time from BSEE to abandon the Popeye wells which were deemed "idle iron."
5. SOI's use of the Atwood Condor was consistent with industry practice of prudent operators.
6. The original plan to use the split campaign of the Q4000 and the Deepwater Nautilus would have been a costlier and less efficient method of executing the Popeye Abandonments.
7. The use of Information Only AFEs is common practice within the industry for government mandated work.
8. It was standard practice at the time the Unit Operating Agreement was signed to refer to all types of well operations under the umbrella of "drilling."
9. The Ensco 8505 as configured and used by Marubeni for their Canyon Express abandonments could not have abandoned the Popeye Wells.[10]

The parties move to exclude some or all of these opinions at trial. The Court considers each argument in turn.

## LAW AND ANALYSIS

Federal Rule of Evidence 702 permits an expert witness with "scientific, technical or other specialized knowledge" to testify if such testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," so long as (1) "the testimony is based upon sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case."[11] Furthermore, Federal Rule of Evidence 703 provides: "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."[12] Rule 703 continues:

> If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be

---
[10] R. Doc. 339 at 1–3.
[11] FED. R. EVID. 702.
[12] FED. R. EVID. 703.

3

inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.[13]

As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight of the evidence rather than its admissibility, and should be left for the finder of fact.[14] "Unless wholly unreliable, the data on which the expert relies goes to the weight and not the admissibility of the expert opinion."[15] Thus, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[16] The Court is not concerned with whether the opinion is correct, but whether the preponderance of the evidence establishes that the opinion is reliable.[17] "It is the role of the adversarial system, not the court, to highlight weak evidence."[18]

## I. Challenges to Experts' Qualifications

SOI first challenges the qualifications of ENI's experts, Bryan and Lee.[19] Similarly, in its motion in limine, ENI argues SOI's expert, Labiche, is not qualified to render certain opinions he offers in his expert report.[20]

"To qualify as an expert, 'the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid

---

[13] *Id.*
[14] *See Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004).
[15] *Rosiere v. Wood Towing, LLC*, No. 07-1265, 2009 WL 982659, at *1 (E.D. La. Apr. 8, 2009) (citing *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996)) (emphasis added); *Wolfe v. McNeil-PPC, Inc.*, No. 07-348, 2011 WL 1673805, at *6 (E.D. Pa. May 4, 2011).
[16] *Pipitone*, 288 F.3d at 250 (quoting *Daubert*, 509 U.S. at 596) (internal quotation marks omitted).
[17] *See Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012).
[18] *Primrose*, 382 F.3d at 562.
[19] R. Doc. 191-1 at 1; R. Doc. 196 at-1 at 1. Notably, SOI does not argue Mr. Kimbrough is not qualified to testify as an expert on offshore P&A operations. Likely, this is because Mr. Kimbrough has "directly planned, executed, and led dozens of offshore projects utilizing floating rigs, including P&A operations . . . in the Gulf of Mexico," and has "planned, managed and executed P&A projects" and "participated in the preparation and execution of [AFEs]" since 1978. R. Doc. 184-4 at 2. Rather, SOI takes issue with the bases and sources of Mr. Kimbrough's opinions.
[20] R. Doc. 188-1 at 16–18.

4

the trier in his search for truth.'"[21] An expert may be qualified based on "knowledge, skill, experience, training, or education."[22] "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject."[23] However, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."[24]

    A. <u>Bryan</u>

SOI argues Bryan is not qualified to testify at trial regarding the opinions he offers in his expert report. According to SOI, Bryan should not be permitted to offer these opinions, arguing that Bryan lacks the requisite experience and knowledge: (1) "of working with Unit Operating Agreement[s] ("UOA[s]") to offer any opinions on the interpretation and application of these specialized agreements," (2) "of working with or issuing Authority For Expenditures (AFEs) to offer any opinions as to their validity," and (3) "relative to selection of equipment to offer any opinions as to what was consistent with industry custom and practice."[25] SOI's arguments rest primarily on the fact that "Mr. Bryan is a landman,"[26] and this case involves the P&A of four offshore wells.

---

[21] *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992)).
[22] *Hicks*, 389 F.3d at 524; *see also Kumho Tire Co.*, 526 U.S. 137, 151, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (discussing witnesses whose expertise is based purely on experience).
[23] *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)).
[24] *Id.*; *see Daubert*, 509 U.S. at 596.
[25] R Doc. 191-1 at 9.
[26] *Id.* SOI also takes issue with the fact that Bryan "has never been qualified as an expert in any court." *Id.* However, although Bryan has never been admitted as an expert, as ENI points out, and SOI admits, this is not because a court has deemed Bryan unqualified to testify as an expert; rather, Bryan has never been accepted as an expert, because he has never been offered as one. *See* R. Doc. 191-1 at 9 ("[T]his is the first case in his 30 + year career in which he was retained as an expert."); R. Doc. 206 at 1.

i. Bryan has sufficient experience to opine on UOAs used in the oil and gas industry

Bryan has over twenty years' experience in managing offshore assets and joint account relationships in the Gulf of Mexico.[27] From 1984–2016, Bryan worked as an in-house consultant, where he "primarily . . . interact[ed] with other companies, negotiating joint ventures, farm-out agreements, operating agreements."[28] According to Bryan, he has negotiated "50 or 60" operating agreements and "negotiated operating agreements that just then got adopted to be a UOA."[29] The Court finds Bryan is qualified to testify about unit operating agreements within the oil and gas industry.

ii. Bryan lacks sufficient experience to opine on the types of AFEs at issue in this case

With respect to Information Only AFEs, SOI points out that "[d]uring his time dealing with offshore agreements, [Bryan] never generated any sort of AFEs and he never reviewed any operational aspect of an AFE in the context of needing to approve them."[30] In opposition, ENI points to Bryan's employment with Anadarko,[31] which Bryan describes as "one of the five largest deepwater leaseholders and producers."[32] At his deposition, however, Bryan testified that during his time with Anadarko, his "group's only involvement was . . . transmit[ting] [AFEs] to the partners," and that "somebody else generated the AFE."[33] He also testified that he had no specific responsibility or involvement with AFEs "other than forwarding [an] AFE on to someone else."[34] Because Bryan lacks specific experience with AFEs, the Court finds he is not qualified to offer his

---

[27] R. Doc. 191-4 at 2.
[28] R. Doc. 206-1 at 9:3-13.
[29] R. Doc. 206-1 at 37:23–38:18; *see id.* at 14:5–21, 23:24–24:8; R. Doc. 191-4 at 1–2.
[30] R. Doc. 237 at 4.
[31] R. Doc. 206 at 4.
[32] R. Doc. 191-4 at 1.
[33] R. Doc. 206-1 at 28:21–29:3.
[34] *Id.* at 29:4–9.

6

opinion that "[SOI]'s submittal to Eni of 'for information only' Authorization for Expenditures (AFEs) for abandonment of the Popeye wells is not consistent with industry customs and practices regarding the use of information only AFEs."[35]

      iii. Bryan has sufficient experience to opine on the use of short-payments in the oil and gas industry

SOI further argues that Bryan's lack of experience with AFEs "stunts his ability to render the opinion that Eni's ability to short pay complies with industry custom."[36] Although Bryan lacks experience with information only AFEs, he has extensive experience with short payments within the oil and gas industry.[37] For example, in his expert report, Bryan explains:

> When I was employed by a predecessor of Anadarko as the Gulf of Mexico, Regional Land Manager, I supervised the position responsible for receiving and examining the joint interest billings we received from operators each month. If there was an obvious error or inappropriate, incorrect or unauthorized charge, the operator would be contacted and the matter was either resolved or the disputed portion of the joint interest billing was not paid.[38]

Bryan's experience resolving billing disputes between operators and non-operators in the oil and gas industry "will probably aid the trier in his search for truth.'"[39] Further, SOI has not explained how Bryan's being primarily a "landman" renders his experience inapplicable to the facts of this case.[40] As a result, the Court finds Bryan has sufficient experience to offer the opinion that "Short payment of joint interest billings is a common

---

[35] 191-4 at 4.
[36] R. Doc. 237 at 4.
[37] R. Doc. 191-4 at 14.
[38] R. Doc. 191-4 at 15.
[39] *United States v. Hicks*, 389 F.3d 514, 524.
[40] *See Lee v. Offshore Logistical & Transport, LLC*, No. 15-2528, 2017 WL 6501151, *2 (E.D. La. Dec. 19, 2017) (excluding proffered expert's testimony because *inter alia* "in his deposition testimony, [the proffered expert] admitted he has worked only on inland waterways with tugboats, towboats, and push boats, all of which had metal decks and were not meant to carry cargo on the deck. He admitted he was not familiar with the kind of friction rough deck boards, such as the deck boards on the M/V BALTY, have and whether such boards could provide a safe walking surface without non-skid paint").

industry practice when a non-operator protests all or part of a billing, including in particular when an operator bills for costs incurred for a scope of work that was not authorized by the non-operator."[41] To the extent SOI finds Bryan's experience with short payments inapposite to the short payment at issue in this case, it may expose any perceived deficiencies on cross-examination.[42]

> iv. Bryan has sufficient experience to comment on whether the selection of a specific piece of equipment is consistent with industry custom and practice

SOI argues Bryan lacks the experience necessary to opine on whether the Atwood Condor was the appropriate equipment to use for the Popeye Well P&As. Because of this perceived lack of experience, SOI contends Bryan should not be permitted to offer his opinion that "[SOI]'s charges to the Popeye Joint Account for above market rate equipment for the Popeye abandonments is inconsistent with industry customs and practices."[43]

In opposition, ENI argues "Bryan does not opine on technical aspects of equipment selection." Rather, ENI submits, "Bryan opines . . . that charges to a joint account for above market rate equipment is inconsistent with industry custom, standards, and practice."[44] According to ENI, Bryan's "decades-long role in managing joint accounts and joint account relationships," and "experience with operators trying to use above market rate equipment for joint account activities"[45] qualify him to testify about this issue at trial. ENI again refers to Bryan's employment with Anadarko, pointing to an instance in which Anadarko, an operator, "only charged the joint account at the market rate for the

---

[41] R. Doc. 191-4 at 4.
[42] *See Huss*, 571 F.3d at 452 ("Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility.").
[43] R. Doc. 237 at 3.
[44] R. Doc. 206 at 4.
[45] *Id.*

8

abandonment" rather than Anadarko's "above-market" rate under its "long-term contract" for the rig.[46]

In reply, SOI points out the fact that in his deposition testimony, Bryan could recall only one instance in which Anadarko charged a non-operator a lesser share to compensate for using above market equipment. It argues "[s]ome knowledge of this one event does not amount to knowledge regarding industry custom."[47]

Although Bryan could recall only one instance in which he had personal experience dealing with this kind of situation, "[d]ifferences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."[48] The Court concludes Bryan is qualified to testify regarding whether in his opinion "[SOI]'s charges to the Popeye Joint Account for above market rate equipment for the Popeye abandonments is inconsistent with industry customs and practices."[49] Although SOI makes much of the fact that the majority of Bryan's experience is that of a landman, it does not explain how this experience is inapplicable in this case other than to state it concerns an offshore operation. Further, Bryan has over 20 years' experience with the "management of offshore assets and joint account relationships in the Gulf of Mexico." To the extent SOI finds Bryan's education and experience insufficient, it may cross-examine him at trial.

B. <u>Lee</u>

SOI challenges Lee's qualifications to render opinions regarding industry customs and practices, arguing Lee lacks the experience to offer such opinions.[50]

---

[46] R. Doc. 191-4 at 5–7.
[47] R. Doc. 237 at 3.
[48] *Id.*; *see Daubert*, 509 U.S. at 596.
[49] R. Doc. 191-4 at 4.
[50] R. Doc. 258 at 1. As for his fifth opinion, SOI points out that "Eni concedes that Lee will not seek to interpret the contract that governs this dispute." *Id.*

9

i. Lee is qualified to testify as an expert at trial

As ENI points out, Lee was employed as a landman for thirty-six years with Amoco Production Company ("Amoco"), BP Exploration & Production Inc. ("BP"), and Nexen Petroleum U.S.A. Inc. ("Nexen").[51] During his time with Amoco and BP, Lee's "general duties were to negotiate, draft, finalize and monitor oil and gas contracts."[52] He has "extensive experience monitoring the terms, rights and obligations in various Joint Operating Agreements," which are "the type[s] of contract[s] customarily signed and used between companies in the oil and gas industry to govern the drilling, development and operation of oil and gas fields from their initial exploration drilling phase through their development, production and ultimate abandonment."[53] Throughout his career, Lee has "handled and managed many different oil and gas fields in the Gulf of Mexico—each with their own unique mix of industry co-owners."[54] These fields included "a designated Operator and one or more Non-Operators."[55] In each of his positions, it was Lee's responsibility to "review[] AFEs on behalf of [the] company for approval or for a recommendation of approval."[56] Based on Lee's training and experience, the Court finds he is qualified to offer the first four opinions made in his expert report at trial.[57]

C. Labiche

ENI challenges Labiche's qualification to offer two opinions: that (1) "[t]he use of Information Only AFEs is common practice within the industry for government mandated work,"[58] and (2) "[i]t was standard practice at the time the Unit Operating

---

[51] *Id.* at 2; *see* R. Doc. 184-4 at ¶¶ 1–3.
[52] R. Doc. 184-5 at ¶¶ 1-2.
[53] *Id.* at 2–3.
[54] R. Doc. 184-5 at ¶ 4.
[55] *Id.*
[56] R. Doc. 217-1 at 34:10–20.
[57] *See* FED. R. EVID. 703.
[58] R. Doc. 339 at 1.

10

Agreement was signed to refer to all types of well operations under the umbrella of 'drilling.'"[59] It contends Labiche lacks the experience necessary to render these opinions, pointing to the fact that:

> (1) Labiche has never worked for a company that was a party to an operating agreement: not as an operator, not as a non-operator, not at all.
> (2) Labiche has never worked for a company with assets in the Gulf of Mexico.
> (3) Labiche has never negotiated an operating agreement.
> (4) Labiche has never been employed by a company that has issued an AFE, and he has never received an AFE or been employed by a company that has received an AFE.
> (5) When the UOA was signed in 1992, Labiche was just starting high school and worked in a coffee shop, not in the oil and gas industry.[60]

### i. Labiche is not qualified to offer an opinion on the use of information only AFEs in the oil and gas industry

With respect to Labiche's first opinion—"The use of Information Only AFEs is a common practice within the Industry"—in his deposition testimony Labiche admitted he has never personally encountered information only AFEs, other than the information only AFEs at issue in this case.[61] Further, when asked if he was "aware of any operators besides [SOI] that have performed operations without sending an authorization for expenditure for approval," he responded that he has "asked a lot of folks about this, and I've been told that it is—there is a practice within industry to do this."[62] The Court concludes Labiche is not qualified to testify as an expert regarding the industry's use of information only AFEs.[63]

---

[59] *Id.*
[60] R. Doc. 188-1 at 16.
[61] R. Doc. 188-3 at 24:13–22.
[62] *Id.* at 23:9–22.
[63] *See Huss*, 571 F.3d at 452.

ii. Labiche is not qualified to offer an opinion on standard industry practice "at the time the UOA was signed" in 1992

With respect to Labiche's opinion that "it was standard practice at the time the UOA was signed to refer to all types of well operations under the umbrella of drilling," he supports this opinion by stating it "is evidenced by MMS enforcing the BOP regulations located in Subpart D (Drilling Regulations) for abandonment operations. It wasn't until 2010 that BSEE included any BOP requirements into subpart Q for abandonment operations."[64]

The UOA at issue in this case was executed on November 1, 1992.[65] ENI argues Labiche "had no idea what regulations were in place in 1992 . . . or how MMS (BSEE's predecessor) enforced those regulations. In his deposition, Labiche testified he was not familiar with the regulations from 1993.[66] He also stated that he did not know the extent to which there were differences between BOP regulations and its various subparts, and he did not know which regulations would be applied to abandonments in 1993.[67] Rather, the regulations Labiche discussed in his expert report were implemented following the Deepwater Horizon oil spill,[68] which took place April 20, 2010.[69]

In opposition, SOI does not point to any relevant experience or training Labiche could draw from in coming to his opinion regarding industry practice in 1992.[70] Although the Court's focus should be on the expert's principles and methodology, as opposed to the conclusions they generate, "nothing in either *Daubert* or the Federal Rules of Evidence

---

[64] R. Doc. 188-2 at 20.
[65] R. Doc. 38-2.
[66] *Id.* at 49:18–50:2 (**Q:** Are you saying that maybe these telling me these 1993 CFR's aren't what you're familiar with? **A.** Yes.").
[67] *Id.* at 53:8–24.
[68] R. Doc. 188-2 at 9–13.
[69] *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 910 F. Supp. 2d 891 (E.D. La. 2012).
[70] *See* R. Doc. 205.

requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."[71] As a result, the Court finds Labiche is not qualified to testify as an expert regarding whether "it was standard practice at the time the UOA was signed [in 1992] to refer to all types of well operations under the umbrella of drilling."[72]

## II. Whether Each of the Experts has a Sufficient Basis for Each of His Opinions

In its motions in limine, SOI argues Kimbrough, Bryan, and Lee each base their opinions on insufficient or incomplete facts and sources.[73] Similarly, ENI argues Labiche lacks a sufficient factual basis to support his assertions.[74] When the basis of an expert's opinion is not "wholly unreliable," issues of the facts and sources of the opinion "go to the weight of the evidence, not to its admissibility."[75] Because the proffered experts do not base their opinions on data that is "wholly unreliable,"[76] the Court will not allow its "gatekeeper role [to] invade the province of the jury."[77] The parties may attack the facts and sources underlying each expert's opinion at trial through "[v]igorous cross-examination" and the "presentation of contrary evidence," the traditional means of challenging admissible evidence.[78]

## III. Whether Experts May Offer Legal Conclusions

"Federal Rule of Evidence 702 permits the district court to admit expert testimony that will assist the trier of fact in either understanding the evidence or determining a fact in issue."[79] Federal Rule of Evidence 704 states that "[a]n opinion is not objectionable just

---

[71] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).
[72] *See Huss*, 571 F.3d at 452.
[73] *See* R. Docs. 187-1 at 5–6; 191 at 10; 196 at 8.
[74] R. Doc. 188-1 at 17–18.
[75] *Primrose Operating Co.*, 382 F.3d at 562.
[76] *Rosiere*, 2009 WL 982659, at *1.
[77] *United States v. Miell*, No. 07-101, 2008 WL 5411692, at *10 (N.D. Iowa Dec. 26, 2008).
[78] *See Daubert*, 509 U.S. at 596.
[79] *C.P. Interests, Inc. v. Cal. Pools, Inc.*, 238 F.3d 690, 697 (5th Cir. 2001).

because it embraces an ultimate issue." "The rule was enacted to change the old view that the giving [of] an opinion on an ultimate issue would 'usurp the function' or 'invade the province' of the jury."[80] The rule, however, does not "open the door to all opinions,"[81] and neither Rule 702 nor Rule 704 "permits expert witnesses to offer conclusions of law."[82]

"The Advisory Committee notes make it clear that questions which would merely allow the witness to tell the jury what result to reach are not permitted. Nor is the rule intended to allow a witness to give legal conclusions."[83] "[T]he task of separating impermissible questions which call for overbroad or legal responses from permissible questions is not a facile one," and requires district courts to exclude questions or answers from experts that "would supply the jury with no information other than the expert's view of how its verdict should read."[84]

To determine whether an expert's testimony consists of an impermissible legal conclusion, the Court must determine "first what the disputed expert testimony is, then compare that testimony to the ultimate issues to be decided by the trier of fact."[85] In this case both parties take issue with certain opinions to be offered by their respective experts regarding whether (1) SOI's actions were that of a prudent operator, (2) SOI's use of Information Only AFEs in this case violated the UOA, and (3) whether either SOI or ENI complied with the terms of the UOA.[86]

Comparison of these opinions with the issues to be decided by the jury in this case reveals a clear overlap.[87] For example, ENI's proposed jury verdict form asks the jury

---

[80] *Owen v. Kerr McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983).
[81] *Id.*
[82] *See Owen*, 698 F.2d at 240.
[83] *Id.*
[84] *Id.*
[85] *See C.P. Interests, Inc.*, 238 F.3d at 697–98.
[86] *See* R. Docs. 188, 191, 196.
[87] *See* R. Doc. 300.

14

whether SOI "breached . . . the Unit Operating Agreement by failing to act as a prudent operator."[88] Lee states in his expert report: "[SOI]'s conduct does not meet the 'prudent operator' standard."[89] Similarly, Labiche concludes in his expert report that SOI "not only complied with the provisions of the UOA, but it acted as a responsible and prudent Operator."[90] Such opinions merely "supply the jury with . . . the expert's view of how its verdict should read" and will not be permitted at trial.[91]

"[T]he line between permissible and impermissible lines of questioning can be difficult to draw, particularly without the context of live testimony at trial."[92] Therefore, the Court's wholesale exclusion of the proposed experts' opinions that go to the ultimate issue for the jury would be premature at this point. However, the parties should anticipate that the Court will not admit expert testimony at trial that amounts to nothing more than a legal conclusion.[93] The Court offers the following guidance:

> The example given in the Advisory Committee Notes to Rule 704 is helpful. The question "Did T have capacity to make a will?" should be excluded. The question "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" is permissible. The first question is phrased in such broad terms that it could as readily elicit a legal as well as a fact based response. A direct response, whether it be negative or affirmative, would supply the jury with no information other than the expert's view of how its verdict should read. Moreover, allowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant.[94]

In this case for example, provided the examining attorney has laid the proper foundation, an expert may testify as to whether "under all the pertinent circumstances disclosed by

---

[88] R. Doc. 300-2 at 2.
[89] R. Doc. 258-1 at 14.
[90] R. Doc. 188-2 at 21.
[91] *See Owen*, 698 F.2d at 240.
[92] *Tajonera v. Black Elk Energy Offshore Ops., LLC*, No. 14-1714, 2016 WL 8274173, at *8 (E.D. La. May 26, 2016) (citing *Owen*, 698 F.2d at 240).
[93] *See Owen*, 698 F.2d at 240.
[94] *Id.*

the evidence" SOI's conduct was consistent with an "exercise of good faith and sound discretion in doing what a reasonably prudent operator would do."[95] To be clear, no expert will be permitted to testify that SOI was or was not a prudent operator. Nor will an expert be permitted to testify that SOI did or did not comply with the terms of the UOA. These are issues reserved for the jury.

Finally, SOI argues "Mr. Bryan's frequent references to industry custom should be precluded unless the Court concludes that the UOA is ambiguous."[96] The Court reminds SOI that "[t]he Court already has found the UOA ambiguous, and that the trier of fact will have to determine the intent of the parties."[97] As a result, "the Court may consider the custom of the oil and gas industry to determine the true intent of the parties, as well as extrinsic evidence, including expert testimony, to determine such industry customs."[98]

### IV. Experts May Only Testify Regarding Opinions Stated in Their Expert Reports or Expanded Upon in Their Deposition Testimony

Under Federal Rule of Civil Procedure 26(a)(2), expert reports must contain "a complete statement of all opinions the witness will express and the basis and reasons for them."[99] The rule also allows a party to "supplement these disclosures when required under Rule 26(e)."[100] Rule 26(e) requires parties to supplement disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."[101] When an expert is "questioned on the recently obtained information at his deposition, the

---

[95] *Duke v. Sun Oil Co.*, 320 F.2d 853, 865–66 & n.21 (5th Cir. 1963).
[96] R. Doc. 191-1 at 12.
[97] R. Doc. 281 at 1; *see* R. Doc. 146.
[98] *Dickson v. Sklarco LLC*, No. , 2014 WL 4443423, at *4 (W.D. La. Sept. 9, 2014).
[99] FED. R. CIV. P. 26(a)(2)(B).
[100] FED. R. CIV. P. 26(a)(2)(E).
[101] FED. R. CIV. P. 26(e)(1)(A).

deposition functions much like a supplemental expert report, and may be said to 'expand' the scope of the formal expert report."[102]

In this case, the Court ordered SOI to provide the Court and opposing counsel with a list of the specific opinions Labiche intends to offer at trial.[103] In response, SOI stated that Labiche will offer nine opinions,[104] two of which were not included in Labiche's expert report:

(1) "It is industry custom for Operators to enter long term rig contracts for a variety of oil and gas operations."[105]
(2) "The Ensco 8505 as configured and used by Marubeni for their Canyon Express abandonments could not have abandoned the Popeye Wells."[106]

Labiche's first opinion regarding long term rig contracts was not included in Labiche's expert report or his discussed at his deposition. Pursuant to Federal Rule of Civil Procedure 56, the Court will not permit Labiche to offer this opinion at trial.[107] Labiche discussed his second opinion regarding the Ensco 8505 and its P&A capabilities during his deposition.[108] Because Labiche's deposition testimony "'expanded' the scope of [his] formal expert report," the Court will permit Labiche to offer this opinion to the jury, provided counsel lays the proper foundation.[109]

---

[102] *S. Pac. Transp. Co. v. Builders Transp., Inc.*, No 90-3177, 1993 WL 185620, at *16 (E.D. La. May 25, 1993).
[103] R. Doc. 338.
[104] R. Doc. 339.
[105] *Id.* at ¶ 2.
[106] *Id.* at ¶ 9.
[107] SOI also argues "any opinion by Mr. Bryan not included in his expert report should be excluded," R. Doc. 191-1 at 1; and "requests that any opinion by Lee not included in his expert report be excluded," R. Doc. 196-1 at 1. SOI did not identify testimony that was not included in these experts' reports, but would be offered at trial. SOI is free to reurge its objection at trial. Additionally, ENI objects to much of Labiche's proposed expert testimony on relevance grounds. However, as the Court previously mentioned, "[t]he line between permissible and impermissible lines of questioning can be difficult to draw, particularly without the context of live testimony at trial." *Tajonera*, 2016 WL 8274173, at *8. ENI may renew its objection to Labiche's testimony on relevance grounds at trial when the Court can evaluate his live testimony.
[108] Labiche Dep. 13:13–19:6, 80:12–82:2, 90:1–91:23, Nov. 13, 2017.
[109] *S. Pac. Transp. Co.*, 1993 WL 185620, at *16. Specifically, the Court will permit Labiche to testify only with respect to the opinions listed in R. Doc. 339, with the exception of the opinions listed in the second, seventh, and eighth paragraphs. The listing in R. Doc. 339 moots several of ENI's objections to Labiche's

Accordingly;

## CONCLUSION

**IT IS ORDERED** that Plaintiff Shell Offshore, Inc.'s motion in limine to exclude the testimony of Jim Bryan[110] at trial is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that Plaintiff Shell Offshore, Inc.'s motion in limine to exclude the testimony of Tom Lee[111] at trial is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that Plaintiff Shell Offshore, Inc.'s motion in limine to exclude the testimony of Geoffery Kimbrough[112] at trial is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant ENI Petroleum US LLC's motion in limine to exclude the testimony of Lance Labiche[113] at trial is **GRANTED** in part and **DENIED** in part.

**New Orleans, Louisiana, this 9th day of April, 2018.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

testimony, such as ENI's objection regarding Labiche's opinion on BSEE's position with respect to certain issues in this case. *See* R. Doc. 188-1 at 10–11.
[110] R. Doc. 191.
[111] R. Doc. 196.
[112] R. Doc. 187.
[113] R. Doc. 188.